MICHAEL R. UTZ AND SHIRLEY A. UTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Utz v. Commissioner
Docket No. 17007-89
United States Tax Court
T.C. Memo 1991-468; 1991 Tax Ct. Memo LEXIS 517; 62 T.C.M. (CCH) 813; T.C.M. (RIA) 91468; September 24, 1991, Filed *517 Decision will be entered under Rule 155. Mark L. Horwitz, for the petitioners. Francis C. Mucciolo, for the respondent. SCOTT, Judge. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' income tax for the calendar years 1981, 1982, and 1983 in the amounts of $ 102,912, $ 104,719, and $ 77,642, respectively; an addition to tax for fraud under section 6653(b)[1] for the year 1981 in the amount of $ 51,456; additions to tax for fraud under section 6653(b)(1) for the years 1982 and 1983 in the amounts of $ 52,359.50 and $ 38,821, respectively; additions to tax under section 6653(b)(2) for each of the years 1982 and 1983 in the amount of 50 percent of the interest due on $ 104,719 and $ 77,641, respectively; and additions to tax for substantial understatement under section 6661 for the years 1982 and 1983 in the amounts of $ 26,179.75 and $ 19,410.25, respectively. *518 The issues for decision are: (1) Whether assessment or collection of tax for each of the years 1981, 1982, and 1983 is barred by the statute of limitations; (2) whether petitioners are liable for the additions to tax for fraud as determined by respondent; (3) whether petitioners are liable for the additions to tax under section 6661 for substantial understatement for the calendar years 1982 and 1983; and (4) whether petitioners failed to report nonemployee compensation of petitioner Michael R. Utz of $ 47,962.81 from A. L. Williams Company in 1983. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, Michael R. and Shirley A. Utz, husband and wife, who resided in Longwood, Florida, at the time of the filing of their petition in this case, filed joint Federal income tax returns for each of the years 1981, 1982, and 1983. Petitioners' Federal income tax returns for the calendar years 1981 and 1982 were timely filed. Petitioners' 1983 Federal income tax return was received by the Internal Revenue Service Center, Atlanta, Georgia, on April 26, 1984. Petitioner, Michael R. Utz (Mr. Utz), received a bachelor's degree in business administration *519 from the University of Central Florida with a major in finance in 1972. [2] He became a certified financial planner in 1979 or 1980. Mr. Utz took extension courses from the College of Financial Planning in Denver in connection with becoming a certified financial planner and after taking these courses, took certain examinations that he had to pass to be certified. After graduating from college, Mr. Utz began working in the insurance business. He, also, prior to the years here involved, was engaged in selling investment funds and, as previously stated, was a certified financial planner. Mr. Utz in 1972 began working with a firm that later became A. L. Williams. Mr. Utz was associated with the A. L. Williams Company during the years here in issue *520 and was associated with that company at the time of the trial of this case. During the years in issue, Mr. Utz was a regional or senior vice president of A. L. Williams and was in charge of the office of A. L. Williams in the Orlando area. Mr. Utz' business activities involved marketing, management, travel, and training. He had a number of agents working under him. He was responsible for the training and the work of these agents. Shirley Utz (Mrs. Utz) earned a college degree in elementary education. She taught school for about 8-1/2 years. While she was in college, Mrs. Utz did some office work at Executive Leasing, Inc., in Orlando. In 1982 and later years, Mrs. Utz worked part time at Mr. Utz' office at A. L. Williams. In 1977 and 1978, Mr. Utz transacted business as a sole proprietor under the name Financial Planning Institute. On January 12, 1979, Mr. Utz incorporated Financial Planning Institute, Inc., in the State of Florida. Petitioners on their 1979 Federal income tax return reported that Mr. Utz did business as a proprietorship under the name Financial Planning Institute. Mr. Bill Wakeman (Mr. Wakeman) was a salesman who worked for Mr. Utz selling insurance *521 and mutual funds. Sometime in the late 1970s, Mr. Wakeman approached Mr. Utz with the idea of Mr. Utz' setting up a so-called local chapter of the Universal Life Church (ULC). Mr. Wakeman showed Mr. Utz a decision by a judge of a United States District Court involving the ULC in Modesto, California. He also showed Mr. Utz a copy of the Constitution of the United States, particularly the amendment with reference to freedom of religion. Mr. Utz paid Mr. Wakeman $ 1,200 for Mr. Wakeman's setting up the paperwork for a local chapter of the ULC for Mr. Utz. Petitioners formed their ULC chapter on December 27, 1979. Their ULC charter agreement was signed by Mr. Utz as pastor, by Mrs. Utz as secretary, and by Mr. Utz' sister as treasurer. Mr. Utz did not know what Mr. Wakeman's status was with the ULC. Mr. Wakeman presented the ULC chapter and the setup with deposits by Mr. Utz to a ULC chapter bank account of funds which would be claimed as charitable deductions but used by Mr. Utz for personal purposes as a tax shelter. Petitioners' ULC chapter never held religious services, never had a congregation, and never had a house of worship. Petitioners set up a bank account in the name *522 of their ULC chapter, but gave as the identification number of the account the identification number of the ULC in Modesto, California. Mr. and Mrs. Utz were the only signatories of the ULC chapter account and the address given for the account was their home address. In 1979 Mr. Utz drew a check on his personal account for $ 45,000, which was deposited in the ULC chapter account over which he and Mrs. Utz had the sole signatory authority. Petitioners had David A. Jones, a Certified Public Accountant (CPA), prepare their 1979 income tax return. Petitioners showed Mr. Jones the check drawn to the ULC for $ 45,000 to support a charitable deduction claimed in their 1979 return of $ 37,101 as a contribution to a church. Mr. Utz had known Mr. Jones in college. Mr. Jones had been a CPA since approximately 1974, but had just opened his own office in 1979. His office was across the street from Mr. Utz' office. Petitioners did not inform Mr. Jones that the $ 45,000 check made out to the ULC, which formed the basis of their church charitable deduction on their 1979 return, had been deposited to a checking account over which they had signatory control. Petitioners used the funds from *523 their ULC chapter account to pay personal and household expenses, but they did not inform Mr. Jones of the fact that such expenses were paid from the account to which the $ 45,000 check was deposited. It was the policy of Mr. Jones to ask his clients for some proof of a large contribution, such as a receipt or a canceled check. After he was shown the canceled check to ULC, Mr. Jones did not make further inquiry of Mr. Utz as to the claimed charitable contribution. If petitioners had disclosed to Mr. Jones the fact that the $ 45,000 check was deposited to an account over which they had sole control and the funds so deposited were spent for their personal and household expenses, Mr. Jones would not have prepared a return claiming a charitable contribution based on this check for petitioners' year 1979. It was never petitioners' intention to give any money to the ULC in Modesto, California. It was always their intention to use the money deposited in their ULC chapter account for their own benefit. Petitioners never made any payment to the ULC in Modesto, California, other than a $ 25 fee paid through Mr. Wakeman for the documents which were used by petitioners as their charter *524 agreement. In March 1980, Mr. Utz opened a money market account with Capital Preservation Fund, Inc., in Palo Alto, California, in the name of petitioners' ULC chapter with a deposit of $ 40,000. Mr. Utz signed the account application and the signature card as "minister" and noted on the signature card that the type of account was a "nonprofit" corporation. Mr. Utz selected Capital Preservation Fund, Inc., in which to make an investment because it offered a higher rate of return than many other accounts. In the account application Mr. Utz listed as the identification number of his ULC chapter the employer identification number of the ULC in Modesto, California. In the application for the account Mr. Utz showed as the address of the ULC chapter a post office box he opened in Altamonte Springs, Florida. It was to that address that the Capital Preservation Fund, Inc., sent account statements for petitioners ULC chapter account. In this account application Mr. Utz showed his home telephone number as the business and home telephone numbers of petitioners' ULC chapter. Mr. Utz never had a telephone listing in the name of ULC or his ULC chapter. On January 1, 1981, the balance in *525 the ULC Capital Preservation Fund, Inc. account was $ 43,569.37. No statements on the Capital Preservation Fund, Inc. account in the name of petitioners' ULC chapter were sent to the ULC in Modesto, California, and Mr. Utz never notified the ULC in Modesto, California, of the account or made the ULC in Modesto, California, aware of the account. On February 19, 1981, Mr. Utz deposited $ 28,000 to petitioners' ULC chapter account with Capital Preservation Fund, Inc., by a check drawn on the account of petitioners' ULC chapter in a bank in Winter Park, Florida. Petitioners gave to the Winter Park National Bank in Winter Park, Florida, as the address of their ULC chapter, the address of their residence at the time the account was opened. On January 16, 1981, Mr. Utz incorporated F.P.I. Corporation in the State of Florida. No income tax returns were ever filed by F.P.I. Corporation. On February 26, 1981, petitioners formed Capital Concepts, Ltd., as a limited partnership in the State of Florida. Mr. Utz signed the limited partnership certificate and agreement as president of F.P.I., Inc., and Mrs. Utz signed as treasurer and trustee of "Charter No. 33423, Universal Life Church, *526 Inc." In the limited partnership certificate and agreement F.P.I., Inc., is listed as the general partner and ULC as a limited partner. The address set forth for both F.P.I., Inc., and ULC in these documents was the address at the time of petitioners' residence. Mr. Wakeman helped petitioners draw up the limited partnership certificate and agreement. The certificate of limited partnership showed as capital contributions $ 132 for F.P.I., Inc., the general partner, and $ 468 for ULC, the limited partner. The limited partnership certificate and agreement also used petitioners' residential address as the principal place of business of the limited partnership. When Mr. Utz received commission checks for insurance and mutual fund sales he made through A. L. Williams, he endorsed many of these checks to Capital Concepts, Ltd., and deposited them in a bank account in the name of Capital Concepts, Ltd. The total amount of such deposits by Mr. Utz to the Capital Concepts, Ltd. account, minus certain withdrawals he made therefrom, were $ 153,983.42 in 1981, $ 192,030.43 in 1982, and $ 149,513.21 in 1983. Sometime shortly after petitioners had formed the limited partnership, Capital Concepts, *527 Ltd., Mr. Wakeman introduced Mr. Utz to a Mr. Scott Slayback (Mr. Slayback). Mr. Utz engaged Mr. Slayback to prepare his Federal income tax returns for 1980, 1981, 1982, and 1983. Petitioners did not know anything about Mr. Slayback's educational background and did not question him about his education. In fact, Mr. Slayback never attended college, never took any courses in taxation, and was never an enrolled agent with the Internal Revenue Service (IRS). In 1981 through 1983, Mr. Slayback was licensed as an insurance agent. Mr. Slayback never advertised as a return preparer or accountant. He prepared returns only for people who were referred to him. Mr. Utz consulted no one other than Mr. Slayback with respect to his claimed deductions for contributions to ULC and "commissions" claimed as paid to Capital Concepts, Ltd. Mr. Slayback recommended to his clients that they use light blue checks because that color would make checks harder to copy in the event their returns were audited by the IRS. Mr. Slayback suggested to petitioners that they use a blue felt-tip pen in writing their checks because checks written in this manner would be more difficult to copy in case of an audit. *528 At least on one occasion Mr. Slayback suggested to Mr. Utz that he write a check on his ULC chapter account to himself and cash it. Mr. Slayback in talking to petitioner referred to the IRS as the "Gestapo." On their 1980 income tax return petitioners claimed cash contributions of $ 47,742.58. This amount represented an amount deposited by Mr. Utz to the bank account of the ULC chapter petitioners had established, over which account petitioners had control. Petitioners paid for personal expenses, including their mortgage payments and real estate taxes, with the funds they deposited to their ULC chapter account and for which they claimed charitable contributions. On their 1981 income tax return petitioners claimed a charitable contribution to ULC of $ 25,026. In March 1982 petitioners deposited to their ULC chapter account with Capital Preservation Fund, Inc., a check dated December 27, 1981, drawn on Mr. Utz' personal Capital Preservation Fund account in March 1982 and backdated. Mr. Slayback sometimes recommended to clients that they hold out some numbered checks at the end of the year in case they needed to backdate a check when their return was being prepared, but he did *529 not remember whether he made such a suggestion to Mr. Utz. Petitioners paid their mortgage payments and real estate taxes on their home in 1981 with funds from their ULC chapter account. In 1981, petitioners deducted on their income tax return the mortgage interest and real estate taxes they had paid with the funds deposited to their ULC chapter account. On September 17, 1981, Mr. Utz deposited $ 12,000 to the Capital Preservation Fund, Inc. account in the name of petitioners' ULC chapter with a check drawn on the Winter Park, Florida, account in the name of petitioners' ULC chapter. On January 1, 1982, the account balance in the Capital Preservation Fund, Inc. account in the name of petitioners' ULC chapter was $ 92,748.91. In 1981 dividends of $ 10,679.55 were credited to the account in the name of petitioners' ULC chapter and reinvested to the Capital Preservation Fund, Inc. account in accordance with Mr. Utz' instructions. None of the $ 10,679.55 was reported as income on petitioners' 1981 income tax return. From 1981 through 1985, Mr. Utz maintained a checking account in the name of Capital Concepts, Ltd. In March 1982, Mr. Utz opened a Capital Preservation Fund, Inc. *530 account in the name of Capital Concepts, Ltd., with a deposit of $ 55,000 by a check drawn on the Southeast National Bank account in the name of Capital Concepts, Ltd. Although Mr. Utz was not a partner in Capital Concepts, Ltd., he signed the account application in his own name. In the Capital Concepts, Ltd. Capital Preservation Fund, Inc. account application, Mr. Utz listed 59-2088365 as the taxpayer identification number of Capital Concepts, Ltd. On April 7, 1982, Mr. Utz made a deposit of $ 20,000 to the Capital Concepts, Ltd., Capital Preservation Fund, Inc. account by a check drawn on the Southeast National Bank account in the name of Capital Concepts, Ltd. On April 1, 1982, Mr. Utz drew a check on the Capital Preservation Fund, Inc. account in the name of Capital Concepts, Ltd., in the amount of $ 75,000 to the order of First American National Corporation for 15,000 shares of stock in that corporation, which was purchased in the name of Capital Concepts, Ltd., but not shown as an asset on the Capital Concepts, Ltd. balance sheet for the year 1982. In both 1982 and 1983, dividends were credited to the Capital Concepts, Ltd. account with Capital Preservation Fund, Inc. *531 None of the dividends so credited were reported on petitioners' income tax returns. Capital Preservation Fund, Inc., issued Forms 1099 reflecting amounts of dividends credited in both 1982 and 1983 to the ULC chapter account by Capital Preservation Fund, Inc., and these dividends were not reported by petitioners in either year. In September 1982, Mr. Utz opened a Growth Investors mutual fund account in the name of petitioners' ULC chapter with Twentieth Century Investors, Inc., by a check of $ 50,000 drawn on the Capital Preservation Fund, Inc. account of petitioners' ULC chapter. Mr. Utz switched this amount from the Capital Preservation Fund, Inc. account of his ULC chapter to the Twentieth Century Investors, Inc., because he expected a higher rate of return from Twentieth Century Investors, Inc. Although on the Twentieth Century Investors, Inc. application Mr. Utz showed the identification number of ULC, Modesto, California, the address he listed was his post office box in Altamonte Springs, Florida. The account statements were sent to that address and not to the ULC in Modesto, California. The ULC in Modesto, California, did not know about this account. In 1982 there were *532 both dividends and redemptions from the Twentieth Century Investors, Inc. account in the name of petitioners' ULC chapter, the redemption resulting in a capital gain. Neither the capital gain nor the dividends were reported by petitioners on their income tax return. A dividend from the Twentieth Century Investors, Inc. account in petitioners' ULC chapter name was credited in 1983 and a Form 1099 issued for the amount, but the amount was not reported by petitioners on their return. In January 1983 Mr. Utz opened an account with Fidelity High Income Bond Fund with a $ 45,000 check drawn on petitioners' Capital Preservation Fund, Inc. account in the name of petitioners' ULC chapter. This account with Fidelity High Income Bond Fund was opened in the name of petitioners' ULC chapter using as the identification number the identification number of the ULC in Modesto, California. Dividends were credited to this account in 1983, but were not reported by petitioners on their tax return. Mr. Utz in opening the ULC chapter account with Fidelity High Income Bond Fund had given the address of his post office box in Altamonte Springs, Florida, as the address of the opener of the account. *533 Mr. Utz signed a letter to Fidelity High Income Bond Fund regarding the ULC chapter account as "pastor." Both petitioners signed a "corporate resolution" for purposes of arranging to be able to make wire transfers from petitioners' ULC chapter account with Fidelity High Income Bond Fund. Petitioners' ULC chapter was never incorporated. Mrs. Utz signed the corporate resolution as secretary of ULC. Mrs. Utz signed the Capital Concepts, Ltd. partnership certificate and agreement as treasurer and trustee of ULC, Inc. In a manner comparable to the other accounts opened in the name of petitioners' ULC chapter, on August 2, 1983, petitioners opened such an account with Government Securities Fund, Ltd. Here as in previous accounts, the identification number of ULC in Modesto, California, was given and petitioners' post office box address in Florida listed as the address. The 1983 dividends credited to this account were not reported on petitioners' tax return for 1983. In July of 1982, Mr. Utz purchased in the name of Capital Concepts, Ltd., 15,000 shares of stock in A. L. Williams Company. The stock was not shown as an asset on the Capital Concepts, Ltd. return of income for its fiscal *534 year ended March 31, 1983. None of the dividends or interest earned on investment accounts Mr. Utz opened in the name of Capital Concepts, Ltd., was reported as income by petitioners on their Federal income tax returns or by F.P.I., Inc., since no returns were filed for F.P.I., Inc. Mrs. Utz wrote most of the checks on petitioners' ULC chapter bank account which were used for payment of expenses such as home mortgage payments, lawn service, pool cleaner, and pest control. In August 1982, petitioners bought and began making mortgage payments on a new home. These mortgage payments were made by checks signed by Mrs. Utz on the account of petitioners' ULC chapter. Thereafter and throughout the year 1983, petitioners continued to make mortgage payments from this account on their previous residence. The interest on both mortgages was deducted by petitioners on their 1982 and 1983 Federal income tax returns. On June 15, 1983, both petitioners signed a financial statement showing total assets of $ 1,170,062 and a net worth of $ 984,062. When petitioners purchased their new home in August 1982, they made a downpayment of approximately $ 30,000 and in 1983 had a swimming pool built *535 at their new home at a cost of $ 12,900. In 1983 Mr. Utz purchased in the name of Capital Concepts, Ltd., 31,875 shares of stock in the A. L. Williams Company. Neither these shares nor the 15,000 shares previously purchased had been surrendered as of September 26, 1986. On petitioners' income tax returns for each of the years 1981, 1982, and 1983, the commissions received by Mr. Utz in connection with his insurance and mutual fund sales as shown on Forms 1099 issued to Mr. Utz were reported on a Schedule C of his returns. Commissions of $ 231,128.98, $ 238,788, and $ 201,608.40 were reported for the years 1981, 1982, and 1983, respectively, on the Schedule C of such year's return. There was a deduction taken on the Schedule C of each return for the amount of net deposits of Mr. Utz' commission checks made to the Capital Concepts, Ltd. account. These deductions designated as "commissions" on Schedule C of the returns were in the respective amounts of $ 153,983.42, $ 192,030.43, and $ 149,513.21 for the years 1981, 1982, and 1983. On the Schedule C of petitioners' return for each of the years 1981, 1982 and 1983, petitioner showed Mr. Utz' business name as "self." F.P.I., Inc., *536 never paid any income tax with respect to any income from Capital Concepts, Ltd. The address of F.P.I., Inc., on the Capital Concepts, Ltd. returns of income was the address of Mr. Utz' office at A. L. Williams. In the Schedules K-1 for F.P.I., Inc. attached to the Capital Concepts, Ltd., partnership returns of income for the taxable years ended March 31, 1982, and March 31, 1983, F.P.I., Inc.'s distributive share of the ordinary partnership income was shown as $ 32,512.66 and $ 20,081.87, respectively. Mr. Utz never paid any tax on behalf of F.P.I., Inc. on its reported distributive share of Capital Concepts, Ltd. income. Mr. Utz had unrestricted control of F.P.I., Inc.'s distributive share of the Capital Concepts, Ltd. income. Mr. Utz never sent the partnership Schedules K-1 to the ULC headquarters in Modesto, California, or informed the ULC headquarters in Modesto that it or his ULC chapter was a partner in Capital Concepts, Ltd. The ULC chapter listed as the limited partner in the Capital Concepts, Ltd. partnership returns of income never filed an income tax return. Mr. Utz never paid any tax on behalf of his ULC chapter based on its reported distributive share of income *537 of Capital Concepts, Ltd. On May 29, 1981, Mr. Utz purchased three parcels of land in the name of Capital Concepts, Ltd., for $ 116,666. With closing costs the basis of the property was $ 116,795.55. On August 8, 1983, the property was sold for $ 144,300. Mr. Utz signed the warranty deed and settlement statement as president of "F.P.I. Corporation." Petitioners did not report the gain on the sale of this property in their 1983 Federal income tax return. On July 20, 1982, Mr. Utz drew a check on the Capital Preservation Fund, Inc. account in the name of petitioners' ULC chapter in the amount of $ 10,000 to the order of Michael Utz and Shirley Utz. Both petitioners endorsed this check and deposited the proceeds to their personal joint account at Sun Bank. Mr. Slayback prepared the returns of income for Capital Concepts, Ltd., for its fiscal years ended March 31, 1982 and 1983, as well as petitioners' personal returns for 1980, 1981, 1982, and 1983. In Mr. Slayback's files was a draft of a return for F.P.I., Inc., but the return was not completed and not filed. On May 29 and 30, 1984, agents of respondent's criminal investigation division searched the offices of Mr. Slayback *538 and seized certain records. Some of the seized records pertained to petitioners. Two of the documents seized during this search reflected a number of dates when Mr. Slayback had performed services for petitioners, including a list of Forms 1099 addressed to petitioners for the year 1983. Following the search of Mr. Slayback's office, the IRS began a criminal investigation of Mr. Utz, but this investigation did not result in an indictment. The investigation of Mr. Slayback did result in an indictment in 1988 for conspiracy, for aiding and abetting, and for causing the submission of false tax returns. There were 45 counts to the indictment and following a jury trial, Mr. Slayback was convicted on 44 of these counts. Mr. Utz was subpoenaed by the Government to testify at Mr. Slayback's trial and did testify at the trial. Petitioners filed their Federal income tax returns for the years 1984 through 1987 on July 19, 1988. These returns were prepared, reviewed, and signed by the firm of Keith Altizer, a certified public accountant. These returns did not show any deductions with respect to contributions to the ULC or any deductions on Schedule C from commissions received by Mr. *539 Utz for checks endorsed to Capital Concepts, Ltd. No return of income was prepared for Capital Concepts, Ltd., for its fiscal year ended March 31, 1984. Petitioners had received a notification from the Atlanta Service Center requesting that they file their 1984 income tax return before that return was filed, so both petitioners knew that the return was delinquent. However, petitioners had made some payments of tax for the years 1984, 1985, and 1986 prior to the time the returns for those years were filed. During the course of his investigation of Mr. Utz' tax liability for the years here in issue, an agent for the IRS issued summonses to the banks at which petitioners had accounts in their own names and in the names of their ULC chapter, Capital Concepts, Ltd., and F.P.I., Inc. Because of directions to the bank not to comply with these summonses, a District Court proceeding was necessary to enforce the summonses. Certain records of Capital Concepts, Ltd., have never been produced for respondent or at the trial of this case. An IRS agent was informed by Mr. Slayback that these records had been destroyed by a warehouse for lack of payment of monthly rent. In 1985 Mr. Utz rented *540 three storage units at U-Lock-It, one under the name of Capital Concepts, Ltd., another under the name of F.P.I., Inc., and a third under the name of ULC. The Capital Concepts, Ltd. unit was 10 feet by 20 feet and the F.P.I., Inc. unit was 4 feet by 8 feet. Mr. Utz removed the boxes from the Capital Concepts, Ltd. unit sometime before September 30, 1985. After September 30, 1985, an employee of the warehouse, U-Lock-It, threw away some bags and boxes in the F.P.I., Inc. unit. In 1982 and 1983 Mr. Utz and a Mr. Gerald Smola, who was a salesman in Mr. Utz' A. L. Williams office, joined in a partnership to buy some real property. Initially each of them paid $ 3,500 to the partnership and approximately 2 months later, $ 150 each. Based on these contributions, Mr. Utz understood that he obtained an interest in the partnership and that 50 percent of the partnership income would be his. Mr. Utz signed the partnership returns of income as general partner. The partnership was run by a Mr. Nuccitelli, who kept the partnership books and employed a CPA to prepare the partnership returns of income. A loss of $ 526 was reported in 1982 and $ 721 in 1983. Mr. Utz did not claim his portion *541 of these losses on his 1982 and 1983 personal income tax returns. In 1981 petitioners filed a petition with this Court with respect to their 1977 and 1978 tax liabilities. One of the issues in the case was the amount of Schedule C deductions to which petitioners were entitled for the years involved. The disallowance of the deductions was based on a failure to provide records to substantiate the deductions. In a document filed with the petition, petitioners stated "Filing a tax return is a violation of the self-incrimination part of the Fifth Amendment." Mr. Slayback had helped petitioners in their preparation of this petition. Petitioners never transferred ownership of their residence to their ULC chapter. Prior to 1980, A. L. Williams had become a general agent for Massachusetts Indemnity and Life Insurance Company (MILICO). The commissions from MILICO constituted the principal source of commission income to Mr. Utz for the years here involved. Sometime after the formation of Capital Concepts, Ltd. Mr. Utz requested MILICO to issue his commission checks to Capital Concepts, Ltd. rather than to Michael Utz, but MILICO refused to do this. Mr. Utz and other agents who sold *542 insurance or mutual funds through A. L. Williams received certain advance commissions upon the submission of the application for insurance coverage. The advance commissions paid were earned by the agent as premiums were paid by the insured. The Forms 1099 issued to the agents reflected earned commissions, not advance commission payments. In 1983 Mr. Utz received a $ 37,111 check from Jack Smith, executive vice president of A. L. Williams. This check represented earned commissions due Mr. Utz from National Home Life Assurance Company. A. L. Williams issued a Form 1099 for 1983 to Mr. Utz in the amount of $ 47,962.81. The amount of $ 47,962.81 shown on this Form 1099 was not included in petitioner's gross receipts for 1983 as reported. National Home Life Assurance Company issued Forms 1099 to Mr. Utz reflecting earned commissions. A. L. Williams had been the master general agent for National Home Life Assurance Company, but terminated its relationship with that company in March 1980 and from that point forward, National Home Life Assurance stopped all payments of commissions. In 1983 A. L. Williams negotiated a resolution with National Home Life Assurance Company. The check *543 for $ 37,111 issued to Mr. Utz by a vice president of A. L. Williams was as a result of this settlement. Mr. Utz had been receiving Forms 1099 from National Home Life Assurance Company even though payments had been stopped and had turned these Forms 1099 over to Mr. Slayback. After Mr. Slayback became aware in 1984 that he was under criminal investigation, he advised his various clients, including petitioners, to obtain someone else to prepare their returns for 1984 and later years. Respondent in his notice of deficiency to petitioners for the years 1981, 1982, and 1983, included in petitioners' income all commissions as shown on the Schedule C attached to each year's return without reducing the amount by the claimed "commissions" deduction. For 1983, respondent increased the reported commissions by the $ 47,962.81 shown on the Form 1099 from A. L. Williams, which had not been included in the reported commission income. Respondent also included in petitioners' income the interest and dividend income on the ULC chapter accounts and on the Capital Concepts, Ltd. accounts as well as some small amounts on their personal accounts which had not been reported. Respondent also disallowed *544 the claimed charitable deductions to the ULC and determined additions to tax for fraud and, for the years 1982 and 1983, additions to tax for substantial understatement. The parties are now in agreement with respect to the income and deductions of petitioners for the years here involved, except with respect to the inclusion in petitioners' income for 1983 of the amount of $ 47,962.81 shown on the Form 1099 issued to Mr. Utz by A. L. Williams, which petitioners contend is to the extent of $ 37,111, plus a small unreported amount, a duplication of amounts included in petitioner's income as earned commissions from National Home Life Assurance Company. OPINION The parties agree that absent a showing by respondent that the tax returns filed by petitioners for the years 1981, 1982, and 1983 were fraudulent, the statute of limitations bars assessment and collection of any tax for those years. They also agree that the provisions of section 6501(c)(1) permit the assessment and collection of tax for these years at any time if respondent establishes that petitioners' income tax returns for the years 1981, 1982, and 1983 were false or fraudulent with intent to evade tax. Since it is incumbent *545 on respondent to establish by clear and convincing evidence that a part of the underpayment of tax is due to fraud to sustain his determination of the additions to tax for fraud under section 6653(b), we will discuss the statute of limitations and additions to tax for fraud issues together. The parties agree, as has been recognized in numerous cases, that the burden on respondent to establish fraud with intent to evade tax by clear and convincing evidence is the same with respect to both section 6501(c)(1) and section 6653(b). Whether a portion of the underpayment of tax by a taxpayer is fraudulent within the meaning of section 6653(b) is a question of fact to be determined from the entire record in the case. Stratton v. Commissioner, 54 T.C. 255, 284 (1970). The burden of proving the existence of fraud is on respondent and his burden requires a showing of fraud by clear and convincing evidence. Gajewski v. Commissioner, 67 T.C. 181, 200 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). The crucial question to be determined is whether the taxpayer had an actual specific intent to evade a tax he believed to be owing. Stephenson v. Commissioner, *546 79 T.C. 995, 1005 (1982), affd. 748 F.2d 331 (6th Cir. 1984); McGee v. Commissioner, 61 T.C. 249, 257 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The intent required to be shown may be inferred from circumstantial evidence. Stephenson v. Commissioner, supra at 1006. Respondent's burden is met by a showing by circumstantial evidence that the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes and that there is an underpayment of tax. While fraud will never be presumed, it is also generally not possible to prove the fraudulent intent by direct evidence. Wedvik v. Commissioner, 87 T.C. 1458, 1469 (1986). With the principles governing the determination of fraud in mind, we examine the facts in this case. The record shows that Mr. Utz was an educated man and that he not only sold insurance and mutual funds but also was in charge of a substantial office operation engaged in the sales of insurance and mutual funds. Mr. Utz had also taken the necessary courses and passed the necessary examinations to qualify as a certified financial planner. While Mr. Utz was not specifically versed *547 in the intricacies of the Internal Revenue Code, it is clear that in obtaining a degree in business administration with a major in finance, and in taking the necessary courses and examinations to become a certified financial planner, he was to some extent familiar with income tax matters. Mr. Utz participated in the training of the insurance and mutual fund salesmen who worked in the A. L. Williams office under his supervision. The record is also clear that Mr. Utz set up a so-called chapter of ULC and opened a ULC bank account over which he and Mrs. Utz had complete control with the idea of depositing funds therein, taking a charitable deduction for such deposits, and using the funds for his personal benefit. He took these actions after consulting only a person who was a salesman in his office and who had no qualifications for advising him as to the validity of such a scheme. The fact that Mr. Utz believed that he was evading tax which he owed on the deductions claimed for contributions to ULC is evidenced by the fact that in 1979 he did not give the return preparer full information with respect to the claimed deduction but merely showed him a check made to ULC. It is clear *548 that Mr. Utz knew that the funds deposited in the account of his ULC chapter would not go for any charitable purpose, but rather would be used for his own benefit. It is clear to the Court that a person of Mr. Utz' education would know that such an activity was an evasion of tax. Also Mr. Utz' other actions support the conclusion that he intended to evade a tax he believed to be owing. Mr. Utz did not use his own identification or Social Security number on petitioners' ULC chapter account or an identification number obtained for the account, but rather used the identification number of the ULC in Modesto, California, which had been held to be an exempt organization. Certainly the use of the identification number of the ULC in Modesto was an attempt to conceal the fact that the claimed charitable deductions were not actually for a charitable purpose. The only result that could follow from using the identification number of ULC of Modesto, California, on the income-producing accounts of petitioners' ULC chapter was that any Forms 1099 would carry that identification number and make it much less likely that the existence of the income in an account controlled by petitioners would *549 come to the attention of the IRS. Mr. Utz testified that he was told to use that number because his "congregation" was a part of the mother church. Clearly Mr. Utz knew that the reason for using the identification number of the ULC in Modesto, California, was to conceal who actually owned the accounts and received the income therefrom. In the beginning of the first year here in issue, Mr. Utz formed a partnership, Capital Concepts, Ltd., with a corporation he formed as the general partner and his ULC chapter as the limited partner. Again on any partnership returns of income the identification number of the ULC at Modesto was used for petitioners' ULC chapter. Mr. Utz endorsed a substantial number of his commission checks to Capital Concepts, Ltd., and deposited them in the Capital Concepts, Ltd. account. He used the monies in the Capital Concepts, Ltd. account as his own, but on his tax return deducted the checks deposited in that account as "commissions" paid to Capital Concepts, Ltd. Mr. Utz testified that he could not get the company that paid him most of the commissions to make the checks to Capital Concepts, Ltd., and that is the reason he endorsed the checks over to Capital *550 Concepts, Ltd. Mr. Utz knew that the commission income was his income and this knowledge was reinforced when the company refused to draw the checks to Capital Concepts, Ltd. Mr. Utz tried to justify the deduction of the so-called "commissions" to Capital Concepts, Ltd., on his return by saying that he thought he was working for Capital Concepts, Ltd. However, he drew no salary or any other form of compensation from Capital Concepts, Ltd. He showed on his returns that his business operation was a proprietorship with his name by inserting "self" for the name of his business. Clearly Mr. Utz knew that he was the only earner of the commissions. Furthermore, the fact that not all of his commission checks were endorsed to Capital Concepts, Ltd., belies his claim that he thought he might be earning these commissions as an employee of Capital Concepts, Ltd. Furthermore, Mr. Utz did not file income tax returns for F.P.I., Inc., or F.P.I. Corporation, which was stated to be the general partner of Capital Concepts, Ltd. No tax was paid for F.P.I., Inc. Certainly Mr. Utz understood a partnership and knew that F.P.I., Inc., should report its partnership portion of the income if Capital *551 Concepts, Ltd., was a legitimate operation. The indications of fraud discussed above as well as other indications of fraud, such as the statement in petitioners' petition to this Court for prior years that they were not required to file a return under the Fifth Amendment to the Constitution, show Mr. Utz' initial lack of cooperation with the IRS when an investigation of his returns was started, taking deductions for mortgage interest and taxes on property, which mortgage interest and taxes had been paid with funds which had been claimed as charitable deductions, thereby claiming two deductions for the same funds, and the backdating of a check in March 1982 in an attempt to support a claimed charitable deduction for 1981, all indicate an attempt to conceal, mislead, and otherwise prevent the collection of taxes which Mr. Utz believed to be owing. Petitioners recognize that certain of their activities and particularly certain of Mr. Utz' activities were negligent, but argue that these activities were not fraudulent because they were taken in reliance on advice to Mr. Utz from Mr. Slayback. Mr. Utz testified at the trial that he was told by Mr. Slayback that his setup of the ULC chapter *552 accounts and of the Capital Concepts, Ltd. partnership and the deduction of substantial amounts of his commission checks which were deposited in the Capital Concepts, Ltd. account was a "legitimate tax shelter." We have considered this testimony as well as Mr. Slayback's testimony as to activities with respect to petitioners' tax liabilities. We do not believe that Mr. Utz' reliance on Mr. Slayback to prepare petitioners' tax returns caused Mr. Utz to believe he was entitled to the claimed charitable deductions taken or to reduce his income through deduction of a substantial portion of his commissions in each year for commission checks endorsed to his Capital Concepts, Ltd. account. In the first place, petitioner began the use of both the ULC chapter account in which to make deposits to claim as charitable contributions and the endorsing of commission checks to Capital Concepts, Ltd., before he ever met Mr. Slayback. It is therefore clear that he did not rely on Mr. Slayback's advice in connection with the setup of the two schemes he used to evade tax. A further reason we do not believe petitioner's testimony as to his reliance on Mr. Slayback is that Mr. Utz, a successful businessman, *553 made no investigation whatsoever into Mr. Slayback's qualifications. A less educated and knowledgeable person failing to investigate the background of a person who proposed such fraudulent schemes as those here involved might be merely gross negligence. For a person of Mr. Utz' knowledge and education, such failure is clear and convincing evidence of fraud. From the record as a whole, we conclude that Mr. Utz' failure to investigate Mr. Slayback's background and his advice to him was deliberate because he knew the information he was receiving from Mr. Slayback did not justify the claimed tax benefits and that the returns Mr. Slayback prepared for him were fraudulent. Some of the advice Mr. Slayback gave to Mr. Utz, such as to write checks in a way that they could not easily be copied by the IRS, to backdate checks, to make payments directly to himself of cash from petitioners' ULC chapter account, could have no purpose other than evasion of tax. Petitioner sought no advice from a lawyer or CPA with respect to the tax evasion schemes he was following, even when he must have been alerted by the fraudulent suggestions of Mr. Slayback that Mr. Slayback was not properly preparing *554 his returns but was preparing fraudulent returns for him. Mr. Utz saw and signed these returns. We conclude he knew these returns were fraudulent and filed them with the intent to evade a tax he believed to be owing. Petitioner tries to blame Mr. Slayback for the failure to file F.P.I., Inc. returns. However, the responsibility of seeing that such returns were filed was Mr. Utz'. Mr. Utz did not even testify that it was Mr. Slayback who advised him to use the ULC at Modesto, California, identification number on the various accounts he opened for petitioners' ULC chapter accounts. Since Mr. Utz started this practice before he met Mr. Slayback, Mr. Slayback could not be responsible for this attempt by Mr. Utz to conceal his income. One of the clear indications of fraud is such concealment. In short, we conclude from the record as a whole that Mr. Utz' only reliance on Mr. Slayback was his reliance on Mr. Slayback's helping him to attempt to defraud the Government of taxes he believed to be owing. We conclude from the record as a whole that respondent has proved by clear and convincing evidence that the entire underpayment of tax by Mr. Utz for each of the years 1981, 1982, and *555 1983 was due to fraud with intent to evade tax. Therefore respondent has shown that Mr. Utz is liable for the addition to tax for fraud under section 6653(b) and that the returns filed by Mr. and Mrs. Utz were false and fraudulent with intent to evade tax so that the statute of limitations does not bar the collection of tax for the years 1981, 1982, and 1983 from either petitioner. See Rodney v. Commissioner, 53 T.C. 287, 308-309 (1969). While there is much in the record to arouse suspicions that Mrs. Utz also was a participant in the attempt to conceal, mislead, and evade the payment of taxes she believed to be owing, the record is not as clear with respect to her activities. She did write the checks for the home mortgage payments and other household payments on petitioners' ULC chapter accounts. However, her educational background was not as clearly in the financial area as Mr. Utz'. Also the record is not totally clear as to how much she actually understood about the setup of the ULC chapter accounts and the Capital Concepts, Ltd. partnership. Certainly she had some knowledge of both of these tax evasion schemes since she signed papers connected therewith. A strong *556 suspicion that she did know that petitioners were evading tax exists from respondent's evidence. However, the affirmative actions in opening the various accounts, putting the identification numbers thereon to conceal the receipt of the income, and the setup of the partnership and corporation were done by Mr. Utz. There is some indication in the record that Mrs. Utz' actions were in reliance on her husband's advice or instructions. On the basis of the record as a whole, we conclude that the evidence is not clear and convincing that Mrs. Utz participated in these schemes with sufficient knowledge to believe that she was evading a tax known to be owing. Although petitioners put the section 6661 additions to tax for the years 1982 and 1983 in issue, they make no argument with respect thereto apart from their argument that the statute of limitations bars the assessment of any tax or additions to tax for the years here in issue. We therefore sustain respondent's determination of additions to tax under section 6661 for the years 1982 and 1983. The only remaining issue is whether respondent properly included the entire $ 47,962.81 shown on the Form 1099 for 1983 issued to Mr. Utz by *557 A. L. Williams in petitioners' income. Although respondent included the entire $ 47,962.81 shown on the Form 1099 in petitioners' income, he made other adjustments so that the actual increase in gross income as shown on the Schedule C of petitioners' return for the year 1983 according to petitioners was only a little over $ 18,000. However, the parties argue whether the $ 47,962.81 should be included in petitioners' 1983 income. Petitioners admit that their 1983 income was understated by the $ 12,851.81 which represents the difference in the $ 47,962.81 shown on the Form 1099 and the $ 37,111, which they reported in 1983 as earned commissions because of a check in that amount received by Mr. Utz from the executive vice president of A. L. Williams plus a small amount which is undisputed. There is a substantial amount of testimony in the record with respect to the two amounts and their relationship, as well to the difference in commissions paid and commissions earned. The burden is on petitioners to show by a preponderance of the evidence that their income was overstated by respondent. We have weighed all the evidence in the record in this regard, and although it is not totally *558 clear, we conclude that the income omitted by petitioners in 1983 in connection with commissions from A. L. Williams was actually the difference in $ 37,111 represented by the check, the proceeds of which were reported by petitioner, and the $ 47,962.81 represented by the Form 1099 plus a small uncontested amount. Therefore, we conclude that the increase in petitioners' income for 1983 with respect to this transaction is $ 12,851.81. Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the years in issue.↩
2. The parties stipulated that Mr. Utz graduated from Florida Technological University in August 1972. However, this is evidently an error since Mr. Utz testified that he had a degree in business from the University of Central Florida in Orlando, which he received in 1972.↩